**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **OLIVET BAPTIST CHURCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 1625** |
| | ) | |
| **CHURCH MUTUAL INSURANCE** | ) | **Judge George B. Marovich** |
| **COMPANY,** | ) | |
| | ) | **Magistrate Judge Sheila Finnegan** |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Olivet Baptist Church filed this suit against Defendant Church Mutual Insurance Company for breach of contract (Count I) and violation of Section 155 of the Illinois Insurance Code (Count II) following denial of an insurance claim for damage to the church allegedly sustained during a windstorm. Currently before the Court is Defendant's Motion to Dismiss/Fifth Motion to Compel (Doc. 61), seeking either dismissal of the case or exclusion of evidence or, alternatively, compliance with discovery and an award of fees and costs. This Court recommends that the motion be granted and the specific relief set forth on pages 27 through 29 of this Opinion be ordered, and orders that Plaintiff produce certain documents to Defendant as set forth on pages 29 through 30 of this Opinion.

Even at this late date (discovery closed on September 30, 2014), Plaintiff has failed to provide a comprehensible damages claim despite numerous opportunities to do so. For example, it is unclear whether Plaintiff is claiming damages to one structure (the sanctuary) or three structures (the sanctuary, fellowship hall, and education building). It is also unclear whether the alleged damages total $2,976,315.78,

$5,430,070.66, or some number in between. Defendant sought answers to these and other damages questions from Plaintiff's corporate representative during a Rule 30(b)(6) deposition on the last day of discovery, but the witness was so ill-prepared that his testimony merely added to the confusion. In addition, in response to a prior motion to compel, this Court required Plaintiff to provide specific information about the claimed damages in a fifth supplement to interrogatory answers to be served by August 26, 2014. While Plaintiff did so, about a week later it served a *sixth* and unverified supplemental response with damages calculations that were inconsistent with the prior, signed responses. Finally, Plaintiff produced some damages discovery too late to be used at depositions and still has not produced a damages report referenced in its fifth supplemental interrogatory responses. Plaintiff's lackadaisical approach to discovery is unacceptable and deserving of sanctions since it required Defendant to file multiple motions to compel, will necessitate the re-deposition of witnesses, and has obfuscated the damages that are sought and the evidence on which they are based.

## BACKGROUND[1]

### A.    The Second Amended Complaint

On July 11, 2013, Plaintiff filed a Second Amended Complaint. According to that complaint, Plaintiff is a church entity and Illinois corporation that owns a church at 3101 South King Drive, in Chicago, Illinois (the "Property"). (Doc. 18 ¶¶ 1, 3). Plaintiff purchased an insurance policy (the "Policy") from Defendant to cover the Property. While not alleged in the complaint, it is undisputed that the Policy became effective on February 28, 2011. (Doc. 22 ¶ 2). The next day, on March 1, 2011, the Property

---

[1]     For ease of reference, all citations to page numbers in the filings in this matter are drawn from the CM/ECF docket entries at the top of the filed document.

suffered "damage due to wind, and/or other weather related conditions, as well as other covered events that took place within Cook County, IL." (*Id.* at ¶ 9).

On April 18, 2011, Plaintiff filed a claim with Defendant, "specifying March 1, 2011, as its date of loss, based upon the covered event that occurred on this date, as well as the losses that manifested themselves accordingly." (*Id.* at ¶ 12). On May 18, 2011, Plaintiff sent additional correspondence to Defendant stating it had retained Renaissance Roofing to serve as its roofer of record on this matter. (*Id.* at ¶ 13).

"[B]etween June 1, 2011 and June 21, 2011, there were numerous weather events, including tornados, excessive wind and hail, which affected the Property . . . ." (*Id.* at ¶ 15). "Additionally, on dates up to and including September 3, 2011, additional hail storms and wind events took place in Cook County, IL". (*Id.*). In the fall of 2011, "additional wind events continued to occur." (*Id.* at ¶ 14).

On February 14, 2012, Defendant sent a letter to Plaintiff, completely denying coverage for the loss. (*Id.* at ¶ 17). "In the upcoming months, including but not limited to May of 2012 through August of 2012, additional windstorms, torrential rains and hail storms impacted Cook County, IL., including the Property." (*Id.* at ¶ 18). "[B]ecause Defendant refused to pay for the damages associated with the covered event from the outset, continuing damage has accumulated and worsened the situation exponentially." (*Id.*).

## B.  Defendant's First Motion to Compel (October 30, 2013)

Not surprisingly, from the earliest stages of this case, Defendant has sought discovery regarding (1) the weather-related occurrence or occurrences that Plaintiff asserts caused damages to the Property; and (2) the specific expenses and losses

incurred as a result of each such occurrence. Defendant's efforts included serving Plaintiff with interrogatories on July 11, 2013, requesting the date, time and nature of each occurrence, and a description and itemization of the damages sustained as a result of each occurrence. (Doc. 28 ¶ 2; Doc. 28-1 at 2-6). Defendant also served Plaintiff with requests for production on July 11, 2013, seeking any reports, invoices, estimates or other documents regarding Plaintiff's losses and damages. (Doc. 28 ¶ 2; Doc. 28-1 at 9-11).

On September 4, 2013, Plaintiff served its first set of objections and answers to Defendant's written discovery. (Doc. 28 ¶ 3; Doc. 28-2). In response to Defendant's twenty-five requests seeking a broad range of documents, Plaintiff produced a copy of the insurance policy, and estimates and invoices related to roof repairs at the Property, but nothing else. (Doc. 28 ¶ 5). In response to Defendant's interrogatories seeking information about the weather events that damaged the Property and the nature of the damages, Plaintiff answered that the damages were caused by "storm-related and weather-related events, followed by repeating [sic] torrential rain events" causing an "ongoing problem from March 1, 2011 until the present." (Doc. 28-2, at 14). Plaintiff also stated that it had already provided information about the events and the resulting damages "on an ongoing basis." (*Id.*). Plaintiff expressly reserved the right to supplement and amend each of its discovery responses. (Doc. 28-2, at 3-21).

In an October 7, 2013 letter and in several subsequent phone conversations, Defendant explained to Plaintiff that the discovery responses and production were insufficient. (Doc. 28 ¶¶ 18-21; Doc. 28-3, at 1-2). However, the parties' attempts to informally resolve these issues were unsuccessful. (Doc. 28 ¶ 22). On October 30,

2013, Defendant filed its first motion to compel. (Doc. 28). Defendant argued, among other issues, that Plaintiff failed to produce the documents requested or explain why production was not possible, and Plaintiff failed to state the specific damages it allegedly suffered as a result of Defendant's breach in this case. (*Id.* ¶¶ 8, 13).

Magistrate Judge Arlander Keys held two hearings on this motion to compel in November and December 2013, at which the parties said they were attempting to resolve their discovery disputes. (Doc. 30; Doc. 31). As a result, Judge Keys continued the motion, and ultimately it became moot when Defendant filed a second motion to compel on February 28, 2014.

## C.    The Stephenson Group Damages Report

In the meantime, after continued negotiations over the discovery responses, Plaintiff provided two sets of supplemental objections and answers to Defendant's interrogatories, both of which stated that Plaintiff continued to reserve the right to further amend or supplement its responses. (Doc. 42 ¶ 4; Doc. 42-2 at 26-46; Doc. 42-3, at 2-7). The second set of supplemental answers served on December 13, 2013, state that the damages at the Property were caused by "[s]torm and weather related events . . . on or after March 1, 2011." (Doc. 42-3, at 4). With regard to the specific damages caused by those events, the answers state in pertinent part:

> Storm and weather related events set forth within Plaintiff's most recent lawsuit caused damage to the subject property on or after March 1, 2011. Due the [sic] same, Plaintiff has provided estimates for damages from The Stephenson Group showing repairs to the subject structure in the amount of $2,833,287.28. In addition, repairs to other structures required an amount of $3,053.66. Finally there has bee [sic] a loss of business personal [sic] property in the amount of $139,974.84.

(*Id.*). Plaintiff also provided Defendant with a nearly 700 page damages estimate prepared by The Stephenson Group. (Doc. 61 ¶ 15). The grand total of the damages listed in The Stephenson Group's estimate is far greater than the damages listed in the answers: $4,196,129.41. (Doc. 42-1, at 2-4).

According to The Stephenson Group's 3-page summary, damages to "Building 1" of the church (the sanctuary) amounted to $2,833,287.28, while damages to "other structures" totaled $3,053.66, and associated business and personal property losses were $139,974.84. (Doc 42-1, at 2). The second and third pages of the summary listed damages to "Building 2" (the fellowship hall) of $556,701.50, with associated business and personal property losses of $18,065.77, and damages to "Building 3" (the education wing) of $600,559.30, with associated business and personal property losses of $44,487.06. (Doc. 42-1, at 3-4).

## D. Deacon Henry Sawyer's Deposition (February 12, 2014)

After Plaintiff represented that it had produced all materials responsive to written discovery requests (Doc. 37 ¶¶ 2, 7), the parties engaged in oral discovery. Early on, Defendant opted to depose certain Olivet Baptist Church deacons, including Deacon Henry Sawyer, who also served as Plaintiff's business manager from 2004 to 2007, before a trustee board was assembled to handle those responsibilities for the church. (Doc. 37 ¶ 3; Doc. 37-1, at 11-12). Deacon Sawyer testified as follows about his knowledge of the damage to the Property:

> Q.: I want to be sure that I understand the damage that Olivet is claiming on the policy issued by Church Mutual. Is it just damage to the sanctuary? Is it damage to other portions of the structure?
> ***

> A.: To what I understand [sic] there's damage to the roof which caused damage to some pews and damage to the floor.
> ***
> Q.: That would be in the sanctuary, correct?
> A.: Yes, sir.
> Q.: So your understanding of the damage being claimed is damage to the roof, pews and floor?
> A.: That's correct, sir.

(Doc. 37-1, at 18). Deacon Sawyer went on to describe the specific damage in the sanctuary: water damage to 50 square feet of the wood floor, as well as to three or four wooden pews. (*Id.* at 18-19). This area was roped off since water was leaking and two or three tiles (two feet by two feet in area) had fallen from the drop ceiling. (*Id.* at 19). Later, a titanium cover was placed on the sanctuary roof and the leaking stopped. (*Id.*). Deacon Sawyer testified that he was unable to remember any other damage to the church structure or contents attributed to the event in March of 2011. (*Id.* at 20).

Deacon Sawyer said Plaintiff had stopped using the educational building in 2007 or 2008 because of lack of heat due to the boiler breaking down and having to be constantly repaired. (Doc. 37-1, at 21). Sometime in 2009 or 2010 Plaintiff also stopped heating the sanctuary during cold weather and masses were instead held in the fellowship hall. (*Id.*). Deacon Sawyer had no knowledge of any damage to the roof of the fellowship hall or education building. (*Id.* at 29).

As for the wind events leading to the damage of the Property, Deacon Sawyer said he was not certain whether the high winds were in February of 2011 or March of 2011. (Doc. 37-1, at 23). He remembered a single snow storm and then high winds for one or two days in that time period. He also remembered that the snow storm was in February and that schools were shut down. (*Id.* at 22).

**E.      Deacon Arnold Romeo's First Deposition (February 13, 2014)**

Defendant also deposed Deacon Romeo, who identified himself as the chairman of the deacons' board, a group that helped the trustees board with maintenance supervision and other duties for the church.[2]   (Doc. 37-2 at 4-5).   Deacon Romeo testified that there had been water damage to the interior walls of the sanctuary prior to March 1, 2011.  (*Id.* at 13).   In addition, in the past the City had requested that the church be tuckpointed because water was infiltrating through the steeple and in the church walls.  (*Id.* at 14).  This work was never done, though it was recommended by an engineer.  (*Id.*).   Deacon Romeo also described other damage to the church that predated March 1, 2011, such as peeling paint, plaster falling off the walls in a couple of places, old windows, pews that needed to be repainted or restained, and water infiltration.  (*Id.* at 26-27).

Deacon Romeo remembered a violent storm in early February 2011 that resulted in twenty inches of snow falling and issues on Lake Shore Drive.  (Doc. 37-2, at 19)  He did not recall any problems with the roof after this storm.  (*Id.*).   Nor did he have any specific recollection of any storm on February 28, 2011 or March 1, 2011. (*Id.*).   Deacon Romeo first learned during a Deacon's Board meeting that Pastor Noble and Deacon Sawyer believed an event had taken place on March 1, 2011 that damaged the roof. (*Id.* at 10, 15). This meeting took place day or two after March 1, 2011.  (*Id.* at 14-15).

Although Deacon Romeo stated he had no personal knowledge of damage to the roof from that event, he did see water come through the sanctuary ceiling after this date,

---

[2]      In addition to his position with the church, Deacon Romeo is an attorney who served as a public defender for approximately ten years before he began working in his current position as the Director of the City of Chicago's Advisory Council on Equity at the Commission on Human Relations.  (*Id.* at 4-6).

and this had not happened before. (Doc. 37-2, at 10). He did not recall anyone telling him that the incident on March 1, 2011 caused water to come into the fellowship hall and the education building. (*Id.*). As a result of the damage to the sanctuary roof, he said there was "damage to the interior of the church, there's been continuing damage based on all of what has gone on with our working with [Defendant] over the – since that incident; and that has caused continuous damage and that damage continues." (*Id.* at 11).

Deacon Romeo had only a vague memory of the discussion about filing an insurance claim at the meeting of the Deacons' Board and Pastor Noble following the alleged March 1, 2011 storm. (Doc. 37-2, at 16). However, he knew Plaintiff was "out of coverage" for several months prior to March 1, 2011. (*Id.*). He had met with the Defendant's agent and negotiated the new coverage that went into effect the day before the alleged wind incident that led to the damage claim. (*Id.*). Everyone at the Deacons' Board meeting was aware that the coverage started on February 28, 2011. (*Id.*). Deacon Romeo later explained that Plaintiff had been insured by Defendant for almost 20 years, but based on economics and the downturn in the economy and membership a few years ago, "we lapsed in our insurance." (*Id.* at 27). He said the church's leadership kept working to get it back and had done so every time the church's coverage had lapsed before. (*Id.*).

When questioned specifically about the damage that he believed was caused by the incident on March 1, 2011, Deacon Romeo said he would need to speculate and declined to do so but said he could testify as to his observations: things had fallen from walls in different parts of the sanctuary so had to be cleaned up and he has seen water

come through the ceiling in different places. (Doc. 37-2, at 15). He added, when asked if he would defer to an engineer or expert as to the cause of the damage: "As to the cause of the damage, I would have to. What I can tell you is that something happened. There was a hole. I saw water. I saw damage. That's what I can tell you." (*Id.*). When asked with whom Defendant should speak to find out precisely what damage was caused to the interior of the sanctuary by reason of the weather incident on March 1, 2011, Deacon Romeo suggested Deacon Sawyer, Pastor Noble and "[e]ngineers can tell you the rest." (*Id.* at 25). He also said The Stephenson Group from Texas was given full access to the church for a few days. Deacon Romeo had not seen any of their reports. (*Id.* at 27-28).

**F.    Defendant's Second Motion to Compel (February 24, 2014)**

During depositions, Deacon Sawyer and Deacon Romeo, as well as Deacon Eugene King, testified that Plaintiff possessed certain documents concerning the Property that had been turned over to counsel. (Doc. 37 ¶¶ 3-6, 10). Defendant claimed the documents were responsive to its discovery requests but Plaintiff had not turned them over, despite Plaintiff's representations that it had produced all responsive documents. (Doc. 37 ¶¶ 7-8). These documents included records related to roofing and other structural repairs at the Property, engineering reports, architectural reports, meeting minutes of the Deacon's Board, and photographs of the Property prior to March 1, 2011. (*Id.* at ¶ 10). Defendant made oral requests for the documents during the depositions, and then followed-up in a February 14, 2014 letter. (*Id.* at ¶¶ 3-5, 9-10; Doc. 37-2, at 31-32).

Despite these communications, Plaintiff failed to produce the documents. (Doc. 37 ¶¶ 9-10). On February 24, 2014, Defendant filed its second motion to compel. (Doc. 37). Defendant sought an order (1) compelling production of the documents described in the deacons' depositions; (2) requiring a signed affidavit attesting that Plaintiff's production was complete; and (3) allowing Defendant to re-depose Deacon Sawyer, Deacon Romeo, and Deacon King after production of the documents. (*Id.*).

On February 28, 2014, Judge Keys granted Defendant's second motion to compel in its entirety. (Doc. 40). He specifically found that it was "clear" the documents described in Defendants' discovery requests were in Plaintiff's possession, the documents were "very important" to the case, and it was "imperative" that they be produced without delay. (*Id.*). Judge Keys gave Plaintiff until March 21, 2014 (later extended by agreement to March 26, 2014) to produce the requested documents. (*Id.*; Doc. 42 ¶ 11; Doc. 42-3, at 30-31). Judge Keys also ruled that, if Defendant needed to re-depose some of the previously-deposed witnesses after reviewing the completed document production, the Court would allow this. (Doc. 40).

## G. Defendant's Third Motion to Compel (April 16, 2014)

In a March 20, 2014 telephone conversation, Defendant informed Plaintiff that its interrogatory responses, as supplemented, remained insufficient. (Doc. 42 ¶ 11). Among Defendant's concerns was that Plaintiff had yet to "precisely describe the weather event" which allegedly caused the damages at the Property. (*Id.* at ¶ 14). Shortly after this conversation, Plaintiff made its supplemental production to Defendant, which included an affidavit signed by Deacon Romeo attesting to the completeness of Plaintiff's production. (*Id.* at ¶¶ 12-13). Defendant reviewed the supplemental

production, and still thought it was incomplete (a concern that, it would later turn out, was well-founded). (*Id.* at ¶ 13). Defendant raised its concerns in a letter to Plaintiff. (*Id.*; Doc. 42-3, at 36-37). Once again, the parties were unable to resolve their discovery dispute on their own, and on April 16, 2014, Defendant filed its third motion to compel. (Doc. 42).

In the third motion to compel, Defendant argued that Plaintiff still had not properly responded to its July 11, 2013 interrogatories, or produced all materials that were responsive to its July 11, 2013 document requests. (*Id.* at ¶¶ 3-4; 13-14). Defendant also argued that it would be unproductive to re-depose Deacons Sawyer, King and Romeo (as allowed by Judge Keys) until Plaintiff properly complied with Defendant's discovery requests, including by providing "some detail, <u>any</u> detail, about the alleged weather event of March 1, 2011 which supposedly caused $4.2 million in property damage to the church." (*Id.* at ¶ 16). Defendant also sought various sanctions in its motion. (*Id.* at ¶ 17). Plaintiff filed a written opposition to Defendant's motion on April 24, 2014, arguing that it had made "good faith" efforts to comply with Defendant's discovery requests, and that sanctions were inappropriate. (Doc. 45).

The same day it filed its opposition to Defendant's motion, Plaintiff sent a third set of supplemental interrogatory responses to Defendant. (Doc. 54-3, at 18-36). This time, Plaintiff stated that the damages at the Property were caused by a "storm and weather-related events" on March 1, 2011, followed by "repeating [sic] torrential rain events," and that the condition at the property "worsened after each occurrence." (*Id.* at 22). Plaintiff did not further explain what it meant by "each occurrence," such as by providing any dates or times for such occurrences. Plaintiff also stated that it had

provided to Defendant the documents which "outline[] the damage to the church in this case." (*Id.* at 23-24). As it did with the previous supplemental responses, Plaintiff stated in these third supplemental responses that it reserved the right to further amend or supplement each of its responses. (*Id.* at 20-35).

On April 25, 2014, Judge Keys held a hearing on Defendant's motion to compel. (Doc. 46). The parties advised Judge Keys that they planned to visit the Property and confer further to resolve their discovery disputes, so he continued the motion. (*Id.*). Over the next few weeks, the parties discussed their discovery disputes. (Doc. 54 ¶ 9). Emails and letters sent between the parties' counsel show that Defendant still had not received all the documents that were responsive to its July 11, 2013 requests for production. (Doc. 54-3 at 7-9). These included documents Judge Keys had ordered Plaintiff to produce in March 2013, such as an engineering report regarding water damages at the Property, and photographs of the Property. (*Id.*). Defendant also sought assurance that Plaintiff had produced all records related to The Stephenson Group's damages estimate. (*Id.*).

After this, Plaintiff produced some more (but, as explained further below, not all) materials related to The Stephenson Group's estimate, but delayed producing other documents. (Doc. 54-3, at 10-11). It delayed producing the photographs of the Property because it sought to confirm whether those photographs were "truly in [its] possession," despite Judge Key's earlier determination that Plaintiff possessed them and was required to produce them. (*Id.* at 10-12). Plaintiff also delayed producing an engineering report that Judge Keys had ordered be produced in March 2013. As for interrogatory responses, Defendant informed Plaintiff via email in late May 2014 that

these responses, even as supplemented for a third time, were still incomplete. (*Id.* at 9). Plaintiff agreed to update its answers to Defendant's interrogatories again, but then failed to do so. (*Id.*).

On May 30, 2014, this case was referred to this Court for discovery supervision following the retirement of Judge Keys. (Doc. 48). In the meantime, the parties continued to communicate via email about their discovery disputes. (Doc. 54-3, at 12-13). Plaintiff finally produced the photographs of the Property that Judge Keys ordered be produced in March 2013. (*Id.*).

## H.    Defendant's Fourth Motion to Compel (July 23, 2014)

In early June 2014, Defendant expressed continued concerns that Plaintiff still had not updated its answers to Defendant's interrogatories. After this Court's June 27, 2014 discovery status hearing (attended only by counsel for Defendant), Defendant again emailed Plaintiff about its incomplete interrogatory responses. (Doc. 54-3, at 14-15). Finally, on July 17, 2014, Plaintiff provided a fourth set of supplemental responses to Defendant's interrogatories. (*Id.* at 38-47).

On July 23, 2014, Defendant filed its fourth motion to compel. (Doc. 54). Defendant argued that Plaintiff's interrogatory responses still did not describe the weather event or events that formed the basis of its suit, or confirm whether or not Plaintiff sought damages for more than one occurrence. (*Id.* at ¶ 10). According to Defendant, the interrogatories and responses failed to describe any specific weather events (by type or date) after March 1, 2011 and failed to describe any specific damages incurred on any date after March 1. (*Id.*). Defendant also complained that in each of its responses, Plaintiff reserved the right to further amend or supplement those

14

responses, which implied the prospect of "never ending fact discovery." (*Id.*). Defendant sought an order either (1) barring Plaintiff from introducing evidence at trial concerning the condition of the Property prior to or subsequent to March 1, 2011, or contradicting evidence produced by Defendant of the same; or (2) compelling Plaintiff to answer Defendant's interrogatories, along with certain other relief. (*Id.* ¶ 13). Plaintiff opposed the motion, arguing that it had fully complied with the discovery requests, and Defendant was owed no relief. (Doc. 57).

During a hearing on August 12, 2014, this Court granted Defendant's motion in part and denied it in part. (Doc. 58). Specifically, this Court ruled that:

> Plaintiff shall provide supplemental answers that provide the date for each weather event, a description of each such weather event (e.g., windstorm, hail storm, tornado), and a description of the specific damage to the church resulting from each weather event and cost of repair. To the extent that Plaintiff is unable to provide this information, it must so state in the supplemental answers and will be bound by the answers at trial. Plaintiff's supplemental and signed answers to defendant's interrogatories due by 8/26/2014.

(*Id.*). This Court deferred Defendant's request for sanctions, and denied Defendant's third motion to compel (heard by Judge Keys but not ruled on) as moot given the ruling on the fourth motion to compel. (*Id.*).

### I.  Plaintiff's Fifth Supplemental Answers

On August 26, 2014, Plaintiff served Defendant with its fifth set of supplemental answers to Defendant's interrogatories, which were accompanied by a verification signed by Deacon Romeo that the answers were "true and correct." (Doc. 61, at 11-12). In response to Interrogatory 4 (seeking the precise date, time and nature of the occurrence for which Plaintiff was making a claim against Defendant), Plaintiff answered:

The March 1, 2011 event was a windstorm that caused severe and continuing damage to the subject property. This is the only occurrence that Plaintiff is basing it suit upon. There logically were instances of rain, snow, and other weather-related events that occurred after the March 1, 2011 wind event, but, those are not specific occurrences giving rise to any independent claim in this matter. Those additional incidences simply caused continued damage that resulted from the initial event of March 1, 2011. **Plaintiff cannot testify as to a specific date on which such other events occurred**, but that they were after March 1, 2011.

(*Id.* at 15) (emphasis added).  Plaintiff also amended its answer regarding the amount of

damages claimed from the March 1, 2011 event as follows:

Plaintiff is claiming the following amounts for the windstorm event of March 1, 2011. The specific line by line entries and totals are contained within the **United Construction Consultants, LLC report which is in the possession of Defendant**. Nothing has been paid toward the loss and all amount contained within the United Construction Consultants, LLC report are current unpaid and owed, as follows:

A. Summary for Dwelling
| | |
|---|---|
| Line Item Total | $2,075,380.03 |
| Material Sales Tax | $    58,082.79 |
| Overhead | $  213,346.44 |
| Profit | $  213,346.44 |
| Replacement Cost Value | $2,560,155.70 |
| Net Claim | $2,560,155.70 |

B. Summary for Other Structures
| | |
|---|---|
| Line Item Total | $  126,622.77 |
| Material Sales Tax | $      2,707.73 |
| Overhead | $    12,933.05 |
| Profit | $    12,933.05 |
| Replacement Cost Value | $  155,196.60 |
| Net Claim | $  155,196.60 |

C. Summary for Contents
| | |
|---|---|
| Line Item Total | $  134,930.56 |
| Material Sales Tax | $          26.03 |
| Overhead | $    13,495.66 |
| Profit | $    13,495.66 |
| Replacement Cost Value | $  161,947.91 |
| Net Claim | $  161,947.91 |

(Doc. 61, at 15-16; emphasis added).  While Plaintiff did not provide the "total" amount of the claim, the sum of the "net" claims in Sections A, B, and C is $2,877,300.21.[3]

Defendant contacted Plaintiff the day after it received the fifth supplemental answers, noting, among other issues, that Plaintiff had never produced any report by United Construction Consultants, LLC.  (*Id.* at 20).  Plaintiff then responded that the reference to United Construction Consultants, LLC was an error, and the answers should have referenced the previously-produced report by The Stephenson Group.  (*Id.*).  However, Defendant then noted that the amounts listed in the fifth supplemental answers did not correspond to any of the estimates in The Stephenson Group's report.  It also noted that the terms "dwelling," "other structures" and "contents" in the answers were vague.  (*Id.* at 20-21).  Defendant said it was still waiting for basic information on what specifically was damaged.  Finally, it noted that the supplemental answers made reference only to the sanctuary, so it asked whether Plaintiff was dropping claims for damage to the fellowship hall and education wing.

## J.  Plaintiff's Sixth (Unverified) Supplemental Answers

On September 4, 2014, Plaintiff produced an unverified "Sixth Supplemental Objections and Answers to Interrogatories" which contained yet another answer regarding Plaintiff's itemized damages.  (Doc. 61, at 25-30).[4]  This unverified supplemental answer provided a more detailed and significantly higher damages figure

---

[3]    Although Interrogatory 5 sought the itemization of damages and the cost of repairs to the Property caused by each whether event that formed the basis of Plaintiff's claim, Plaintiff instead provided its itemization of damages and repair costs in response to Interrogatory 6. (Doc. 61, at 15-16).  Plaintiff's response to Interrogatory 5 was the same as its response to Interrogatory 4, but without the last sentence.  (*Id.*).

[4]    The Appendix to this Opinion contains a chart reflecting the progression of Plaintiff's responses to Interrogatories 4 and 5 as they evolved from the original answer to the sixth supplemental answer.

than the verified fifth supplemental answers provided one week earlier, per this Court's

order. This time, Plaintiff's damages itemization provided as follows:

> In regard to the expenses or losses claimed by the Plaintiff in association with the windstorm event of March 1, 2011, all such damage can be found within the previous expert estimate, authored by Shannon Cook with The Stephenson Group in this matter. Moreover, and specific to this Interrogatory and the Court Order regarding the same, Plaintiff would submit that the following damages occurred based upon the above described loss:

> 1. Olivet Baptist Church suffered severe exterior damage to the roof of the church as well as the front, right and left elevations of the structure. Repair to the fencing that surrounds the property as well as the church signage due to the above described event. The following amounts correspond to the specific damage claimed by the Plaintiff in this matter:

> Exterior Damage
> a) Replace entire roof due to wind damage    $ 192,674.22
> b) Repair storm related damage - front elevation    $ 5,950.56
> c) Repair storm related damage - right elevation    $ 12,558.80
> d) Repair storm related damage - left elevation    $ 5,404.68
> e) Signage - replacement due to wind damaged    $ 4,628.08
> f) Fencing - repair storm related damage    $ 2,460.78

> Total: Exterior    $ 223,677.12

> 2. Olivet Baptist Church suffered severe interior damage to the first floor of Building I as a result of the above described event. Specifically, repairs are necessary to the main sanctuary, right and left entrances, and right and left rear stairs. An electrical check is also needed in the sanctuary. The following amounts correspond to the specific damage claimed by the Plaintiff in this matter:

> Interior Damage - Building I - First Floor
> a) Electrical check in sanctuary    $ 2,424.51
> b) Repairs to main sanctuary    $1,724,763.40
> c) Repairs to the right entrance    $ 21,874.55
> d) Repairs to the left entrance    $ 21,583.21
> e) Repairs to the rear stairs - right    $ 93,933.05
> f) Repairs to the rear stairs - left    $ 91,481.95

> Total repairs to Building I – First Floor    $1,956,060.67

3.      Plaintiff suffered damage to personal property as a result of the windstorm event made basis of this suit. The Church's pipe organ sustained water damage and must be replaced. The amount below also reflects labor charges to retrofit the organ into the existing space. The following amount is necessary for replacement of Plaintiff's personal property claimed in this matter as a result of the March 1, 2011 windstorm event:

Replacement of Personal Property
Replace water damaged pipe organ including labor to retrofit new organ.

Total replacement of personal property          $  127,749.94

4.      Due to the above windstorm event which occurred on March 1, 2011, and considering the extensive and necessary repairs needed to Plaintiff's property, in order to preserve the existing personal belongings of Plaintiff, it will be necessary to pack and move furniture and other personal contents of Plaintiff to a storage facility. The amount below reflects the cost of this task and is as follows:

Pack-Out/Content Storage
Off site [sic] climate controlled storage including insurance and 12 men to work for 10 hour days to pack up and move furniture and belongings to facilitate repairs, including move items back and set up after all repairs have been completed.

Total for pack-out and contents storage          $   36,196.80

5.      Due to the above windstorm event which occurred on March 1, 2011, and the extensive repairs needed to the sanctuary and other above described areas within the facility, Plaintiff will be unable to hold its religious sermons and normal facility functions during the repairs stage. Therefore, it is necessary for Plaintiff to temporarily relocate its facility. The amount below reflects the necessary cost of the relocation as follows:

Relocation Expense
The following expense is based upon ten (10) months at $5,500.00 per month for repairs to be made to all three (3) buildings.

Total for relocation expense          $   55,000.00

6.      Plaintiff is claiming additional miscellaneous expenses necessary to facilitate the repairs to its property caused by the wind event of March 1, 2011. The following expenses are as follows and more particularly described within the report authored by Shannon Cook with The Stephenson Group:

Miscellaneous Expenses

| | | | |
|---|---|---|---|
| a) | Temporary construction office | $ | 1,116.32 |
| b) | On site evaluation/supervisor | $ | 42,869.76 |
| c) | Job-site storage container | $ | 968.00 |
| d) | Rental of temporary toilet | $ | 1,440.00 |
| [(e) is omitted] | | | |
| f) | Dumpsters | $ | 5,976.27 |
| g) | Taxes, insurance and permits | $ | 2,700.00 |

Total for miscellaneous expenses        $    55,070.35

Grand total for Sections I-VI        $2,453,754.88

7.        Below is an itemized list of additional job-related expenses necessary to repair Plaintiff's property and resume its function as a house of worship. These charges are covered charges under Plaintiff's dwelling, contents and other structures coverage contained within its policy of insurance. These charges were made necessary due to the extensive repairs needed to its property which was damaged by the wind event of March 1, 2011. These additional job-related expenses are as follows:

O&P Items

| | | | |
|---|---|---|---|
| a) | Acoustical treatments | $ | 14,699.52 |
| b) | Contents:  Clean garments & soft goods | $ | 60,725.76 |
| c) | Contents:  Clean hard furniture | $ | 2,505.60 |
| d) | Cleaning | $ | 7,233.09 |
| e) | Contents:  Packing, handling, storage | $ | 19,308.80 |
| f) | General demolition | $ | 126,981.37 |
| g) | Electrical | $ | 7,083.42 |
| h) | Misc. commercial equipment | $ | 176,336.01 |
| i) | Heavy equipment | $ | 7,875.00 |
| j) | Floor covering - carpet | $ | 33,466.45 |
| k) | Floor covering -wood | $ | 178,596.42 |
| l) | Permits and fees | $ | 2,700.00 |
| m) | Fencing | $ | 2,121.68 |
| n) | Finish carpentry/trimwork | $ | 13,770.33 |
| o) | Fire protection systems | $ | 13.82 |
| p) | Framing and rough carpentry | $ | 34,959.24 |
| q) | Glass, glazing and storefronts | $ | 19,038.40 |
| r) | Heat, vent and air conditioning | $ | 5,024.24 |
| s) | Light fixtures | $ | 6,430.96 |
| t) | Mirror and shower doors | $ | 844.80 |
| u) | Interior lath and plaster | $1,476,077.31 | |
| v) | Painting | $ | 56,929.02 |
| w) | Roofing | $ | 76,772.20 |
| x) | Scaffolding | $ | 8,155.56 |

| | | | |
|---|---|---|---|
| y) | Soffit, fascia and gutter | $ | 22,950.00 |
| z) | Specialty items | $ | 2,384.64 |
| aa) | Temporary repairs | $ | 2,556.32 |
| bb) | Window reglazing and repair | $ | 17,652.92 |
| cc) | Water extraction and remediation | $ | 15,562.00 |

Total for O&P Items      $2,398,754.88

8.    Below is an itemized list of additional expenses directly related to the job-related expenses specified above that are necessary to repair Plaintiff's property. These charges are covered charges under Plaintiff's dwelling, contents and other structures coverage contained within its policy of insurance. These expenses are resulting from damage to Plaintiff's property as a result of a March 1, 2011 wind event. These additional job-related expenses are as follows:

Non-O&P Items

| | | | |
|---|---|---|---|
| a) | Specialty items (Non-O&P) | $ | 55,000.00 |

Total for Non-O&P items      $ 55,000.00
Totals [sic] for O&P Items      $2,398,754.88

Total      $2,453,754.88

| | | | |
|---|---|---|---|
| b) | Materials sales tax | $ | 35,674.76 |
| c) | Repairs to the right entrance | $ | 243,443.07 |
| d) | Repairs to the left entrance | $ | 243,443.07 |

Grand total claimed by Olivet Baptist Church      $2,976,315.78

(*Id.* at 27-30).

The "Grand total claimed by Olivet Baptist Church" of $2,976,315.78 in this

unverified answer is actually not a total of all of the damages listed above, but is only a

total of the damages listed in Sections 6 and 7 of the answers.[5] (*Id.*). The actual total

of all the damages listed in the sixth supplemental answer is $5,430,070.66. This sum

---

[5]    $2,976,315.78 is also the same amount as the total damages listed on the first page of the estimate summary prepared by The Stephenson Group. (Doc. 42-1, at 2). As noted above, that first page listed the damages for only the sanctuary portion of the church.

exceeds the total damages listed in The Stephenson Group's summary ($4,196,129.41) by $1,233,941.25. (Doc. 42-1, at 2-4).

### K. Defendant's Motion to Dismiss/Fifth Motion to Compel (September 16, 2014)

On September 16, 2014, Defendant filed the pending motion to dismiss/fifth motion to compel. (Doc. 61). Defendant argues that Plaintiff's fifth and sixth supplemental answers to its interrogatories are unclear with regard to exactly what damages Plaintiff is claiming. (Doc. 61 ¶¶ 2-11). Defendant also seeks to re-depose Messrs. Cook, Mohr and Stephenson of the Stephenson Group (at Plaintiff's expense and in Chicago) regarding the draft damages estimate report that was not disclosed until the day of Mr. Stephenson's deposition. (*Id.* at 21). Finally, Defendant complained that Plaintiff had not yet made a 30(b)(6) witness available, and sought a date certain for that deposition. (*Id.* at ¶¶ 12-14; 21). As discussed below, this deposition occurred approximately two weeks later when Deacon Romeo was re-deposed on September 30, 2014, but his testimony merely added to the confusion concerning Plaintiff's damages claim.

### L. Rule 30(b)(6) deposition of Deacon Romeo

Two weeks after Defendant filed the pending motion to compel and on the last day of fact discovery (September 30, 2014), Plaintiff presented Deacon Romeo as its 30(b)(6) deposition witness on numerous topics, including the claimed damages. (Doc. 61, at 32-37; Doc. 67-3). One topic on which he was to testify was "the precise location(s) where [the Property] sustained wind or hail damage to its roof or walls which allowed rain or snow to enter the interior of the structure." (Doc. 61, at 35). While Deacon Romeo testified that Plaintiff was making a claim for damage to not only the

22

sanctuary but also the fellowship hall and the education building (Doc. 67-3, at 35), he was unable to provide any details concerning the damage to the latter two areas. When asked for information about penetration of the roof in the fellowship hall and education building, Plaintiff said his only knowledge was derived from The Stephenson Group report. (*Id.*). Deacon Romeo said Plaintiff relied on The Stephenson Group's report and its expertise in "making the determination of what the damage was from the wind event and subsequent damage." (*Id.* at 24, 27). But he then admitted that he had never actually read the Stephenson report or the depositions of representatives from the Stephenson Group. Instead, he had simply seen the portions of the report that were referenced in recent interrogatory responses prepared by Plaintiff's counsel. (*Id.* at 24-26). Deacon Romeo also testified that he did not believe anyone else with Plaintiff had reviewed the Stephenson Group report. (*Id.* at 26).

Deacon Romeo identified his signature on the verification page for Plaintiff's recent fifth supplemental interrogatory answers. (Doc. 67-3, at 63). He also was shown and recognized the unsigned sixth supplemental interrogatory answer. (*Id.* at 69). When asked if he could explain why the damages listed in the fifth supplemental and sixth supplemental answers were different, Deacon Romeo responded, "No." (*Id.* at 84-85). After acknowledging that the sixth supplemental answer did not contain any estimate for damage to the fellowship hall or education wing, Deacon Romeo said that "if there is an estimate on the damage for those other spaces, then those will be forwarded I believe." (*Id.* at 70).[6] He said he did not know what the estimates were for damage to the fellowship hall and education wing. (*Id.* at 71). He also could not say

---

[6]     Of course, to the extent that Plaintiff was claiming damages to the fellowship hall and education building, these damages should have been included in the supplemental interrogatory answers that the Court ordered Plaintiff to serve by August 27, 2014.

whether estimates existed. (*Id.*). When asked whether Plaintiff would be providing an amended answer identifying damage claimed to the fellowship hall and education wing, he responded: "Whatever the Stephenson Group provides is what we will deal with." (*Id.* at 85).

Deacon Romeo also did not know whether anyone had separated the pre-existing damage at the church from damage caused by or resulting from the March 1, 2011 windstorm. (Doc. 67-3, at 77). When shown the page from the fifth supplemental interrogatory responses referencing United Construction Consultants, LLC and asked who this entity was, Deacon Romeo said this was a company hired by Plaintiff's counsel to provide a report. (*Id.* at 63-64). While he had never requested an opportunity to review the report, Deacon Romeo said he believed the damages estimates in it were accurate because he trusted the company as the experts. (*Id.* at 67). Later, he clarified that the United Construction Consultants, LLC and the Stephenson Group are "for want of a better term" the same company since "it's the same people that are working in both companies." (*Id.* at 122-23).[7]

## DISCUSSION

Based on Plaintiff's repeated violations of the rules of discovery and court orders in this case, Defendant seeks as a sanction the dismissal of Plaintiff's suit. (Doc. 61 ¶ 21). Alternatively, Defendant seeks an order barring Plaintiff from introducing at trial any evidence concerning the physical condition of the Property prior to or subsequent to March 1, 2011, and barring Plaintiff from contradicting any evidence presented by

---

[7] Plaintiff's counsel interrupted Deacon Romeo's testimony several times to state that "for the record, there aren't any" estimates other than the one that The Stephenson Group prepared, that "Plaintiffs are relying on the Stephenson [Group] – just FYI," that he had "explained the UCC thing ten times," and that Deacon Romeo's testimony contained "misrepresentations" about the "UCC thing." (*Id.* at 69-70; 88).

Defendant on this topic. (*Id.*). In the event that this Court denies these requests, Defendant requests that the Court: (a) order Plaintiff to answer properly and completely the Defendant's interrogatories; (b) order Plaintiff to produce Messrs. Mohr, Cook and Stephenson on a date certain in Chicago for re-deposition; (c) order a date certain for the re-depositions of Deacons Romeo, Sawyer and King (per Judge Keys' order on February 28, 2014); and (d) order Plaintiff to pay Defendants' attorneys' fees and costs expended and anticipated as a result of Plaintiff's discovery delays and disregard of rules of discovery, including costs incurred for bringing this and prior motions to compel. (*Id.*).

Plaintiff asserts that the motion should be entirely denied. It contends that "[m]uch like its efforts to force Plaintiff to answer, re-answer, and answer once again, the interrogatories Defendant propounded, this insurance carrier seeks to continue hassle [sic] a historic church that has long stated its position regarding this entire claim." (Doc. 66 at 9). Plaintiff denies any intentional wrongdoing.

This Court examines each of the three bases for Defendant's motion, turning first to whether Plaintiff complied with this Court's August 12, 2014 order.

**A. Non-Compliance with the Court's August 12, 2014 Order**

On August 12, 2014, this Court required Plaintiff to serve "supplemental answers that provide the date for each weather event, a description of each such weather event (e.g., windstorm, hail storm, tornado), and a description of the specific damage to the church resulting from each weather event and cost of repair." Since the case had been pending a year and a half and the deadline to complete fact discovery was fast approaching, the Court required the answers to be provided no later than August 26,

2014, deferring the decision of whether to impose sanctions. (Doc. 58). While Plaintiff served the supplemental responses (its fifth) by the deadline, these answers plainly did not comply with the order. Indeed, approximately one week after the Court's deadline, Plaintiff served yet a sixth (unverified) supplemental answer containing significant revisions to the damages figure and itemization set out in the fifth supplemental answer.

Remarkably, even after six supplemental answers, Plaintiff's damages claim remains incomprehensible. Based on the fifth supplemental responses served in apparent compliance with this Court's August 12, 2014 order, Plaintiff appeared to only seek damages related to the sanctuary area of the church, in the total amount of $2,877,300.21. (Doc. 67-1, at 6-7). These damages figures, the supplemental answers stated, were supported by a report from United Construction Consultants, LLC. (*Id.*). While Plaintiff later said the reference to United Construction Consultants, LLC was an error and it should have referred to The Stephenson Group, the damages amounts set forth in the fifth supplemental responses do not correspond to the estimates in The Stephenson Group's report. According to the sixth supplemental answer, the "Grand total claimed by Olivet Baptist Church" is now "$2,976,315.78." (Doc. 67-2, at 8). But if one adds up the specific line items in the eight damages sections of the sixth supplemental answer, the total is actually $5,430,070.66. Moreover, while this supplemental answer states that the damages are found in the "previous expert estimate, authored by Shannon Cook with The Stephenson Group," the total damages listed in The Stephenson Group's estimate summary is $4,196,129.41. In other words, the total in the sixth supplemental answer exceeds the total in The Stephenson Group's report that it references by $1,233,941.25.

Under the circumstances, this Court is not at all persuaded by Plaintiff's argument that its "Fifth and Sixth Supplemental Answers to Interrogatories cannot be more specific and more clear." (Doc. 66, at 12). They are not clear. In addition, the itemization provided in the sixth supplemental answer was provided well after the Court's deadline of August 27, 2014, was not verified, and contained figures that were both internally inconsistent and in conflict with figures in the verified fifth answers. Even in its opposition to the pending motion to dismiss/compel, Plaintiff does not shed any light on the reasons for these discrepancies.

For the reasons discussed above, this Court finds that Plaintiff did not comply with the Court's order of August 12, 2014. Moreover, it should not be necessary for Defendant to file repeated motions to compel to obtain basic information about the damages that Plaintiff seeks in this lawsuit. This Court recommends that Plaintiff be awarded its attorneys' fees and costs in connection with the Third, Fourth and Fifth motions to compel.[8] Defendant is directed to prepare an itemization of those fees and costs and serve them on Plaintiff. While the Court is not recommending an award of attorneys' fees and costs in relation to the second motion to compel (granted by Judge Keys), this is because Judge Keys ruled that Defendant could re-depose the deacons after Plaintiff produced the required documents. This Court recommends that Plaintiff pay the court reporters' fees for these depositions since these costs would have been avoided had Plaintiff produced the documents in a timely fashion. Further, this Court recommends that Plaintiff be barred from (a) offering any new evidence related to damages to the Property and the cause of those damages that it has not already

---

[8]     While this Court denied the third motion to compel, it did so only because the issues were rendered moot when this court granted in part Defendant's fourth motion to compel. Plaintiff, however, has yet to provide the discovery that this Court found Defendant was entitled.

produced during discovery, and (b) seeking compensation for damages to the fellowship hall and education building (assuming it planned to do so) given the failure to disclose such damages in a timely fashion. Finally, this Court recommends that Plaintiff be required to serve a *seventh* supplemental and verified answer to Defendant's interrogatories itemizing the specific damages to the Property resulting from the March 1, 2011 windstorm, not including damages to the fellowship hall and education building.

**B.    Lack of Preparedness of Plaintiff's Corporate Representative**

Plaintiff's corporate representative (Deacon Romeo) was designated to provide testimony concerning damages but as discussed earlier, he was so ill-prepared that he was unable to answer very basic questions. This Court agrees with Defendant that the appearance of Deacon Romeo as a Rule 30(b)(6) corporate representative was a "non-appearance" on the topic of damages given his failure to prepare and inability to answer damages-related questions. (Doc. 67, at 7). This Court therefore recommends that Plaintiff be required to present a Rule 30(b)(6) representative on this topic for deposition again, and to pay the fees of the court reporter. In addition, this Court recommends that Plaintiff pay for one hour of the time of Defendant's counsel during the September 30, 2014 deposition, since at least this much time was wasted due the Deacon Romero's lack of preparation.

**C.    Late Production of Stephenson Group "Estimate Draft" and Failure to Produce United Construction Consultants, LLC Report**

On August 7 and 8, 2014, Defendant deposed witnesses from The Stephenson Group regarding its almost 700 page report, including Shannon Cook, Kevin Mohr, and Robert Stephenson. (Doc. 61 ¶¶16-17). Prior to the depositions, defense counsel was assured that all requested documents had already been produced. But at the start of

the last deposition (of Mr. Stephenson), the witness produced a "zip file" which he claimed only contained materials that had previously been provided. (*Id.*). When defense counsel later reviewed the zip file, counsel discovered that it contained a number of previously undisclosed documents, including a 143-page, draft second estimate that had never been produced.

Plaintiff argues that the "estimate draft" on the zip file was a "mere portion of the final estimate" and was hence "fully covered" in the depositions that were taken. (Doc. 66, at 9). Plaintiff does not attempt to respond, however, to Defendant's argument that the newly-produced, second estimate of $2,706,938 is approximately $1.5 million dollars less than The Stephenson Group's final estimate produced by Plaintiff in compliance with Rule 26. Defendant understandably seeks to question The Stephenson Group witnesses about the reasons for this significant difference, yet was denied the opportunity due to Plaintiff's late disclosure. This Court recommends that Plaintiff be required to make at least one knowledgeable member of The Stephenson Group available for a new deposition in Chicago regarding the second estimate and any other new materials provided in the zip file. In addition, the Court recommends that Plaintiff be required to pay for the court reporter.

Finally, Defendant argues that Plaintiff should be required to produce the report of United Construction Consultants, LLC that Plaintiff referenced in the fifth supplemental interrogatory responses. While Plaintiff suggests that it merely made a mistake and should have referenced "The Stephenson Group" report in the responses, Defendant notes that none of the reports currently in its possession contain the itemization of damages set forth in the fifth supplemental interrogatory answers.

Plaintiff is ordered to produce this report even if it no longer is relying on these damages figures.  This shall be done by January 21, 2015.  To the extent that Plaintiff claims no such report ever existed, Plaintiff is to ensure that its Rule 30(b)(6) corporate representative is able to testify as to the precise source of the damages figures in the fifth supplemental answers, the name of the person who typed "United Construction Consultants, LLC" and the specific damages figures into the document that became the fifth supplemental answers, and what materials that person relied on when doing so.[9]

## CONCLUSION

For the foregoing reasons, this Court recommends that Defendant's Motion to Dismiss/Fifth Motion to Compel (Doc. 61) be granted and that the district judge award the sanctions described above.  Pursuant to Fed. R. Civ. P. 72(b)(2), specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served.  Failure to file objections with the Honorable George B. Marovich within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation.

ENTER:

Dated:  January 7, 2015

SHEILA FINNEGAN

---

[9]     This Court is ordering Plaintiff to produce the discovery rather than "recommending" that the district judge order this.  Unlike the request for monetary sanctions which is "deemed dispositive requiring *de novo* review even though the requested sanction may have arisen in connection *with a discovery dispute*," *Cleversafe, Inc. v. Amplidata, Inc.*, 287 F.R.D. 424, 428 (N.D. Ill. 2012) (citations omitted), this Court certainly has authority to order the production of discovery.

30

| | | |
|---|---|---|
| **Interrogatory** | 4.  For each separate occurrence for which plaintiff is making claim [sic] against Church Mutual please state:  (a) the precise date and time of the occurrence; [and] (b) the nature of the occurrence (examples: hail, windstorm, tornado, torrential rains) . . . . | 5.  Describe and itemize by date of occurrence, nature of occurrence (example: hail, windstorm, tornados, torrential rains) and cost of repair [sic] the damage sustained by you as a result of each of the occurrences described of in Plaintiff's Second Amended Complaint. |
| **Pl.'s Objections and Responses, dated 9/4/13** | Objection. Plaintiff objects as this Interrogatory is overly broad. Subject to the foregoing objection and without waiving the same, this relates to an ongoing problem from March 1, 2011 until the present. It was a result from storm-related and weather-related events, followed by repeating [sic] torrential rain events, and the condition of the property worsened after each occurrence. | All such information was provided to Church Mutual on an ongoing basis. Plaintiff relied on our insurance company, Church Mutual to document each report and investigate each of these incidents. Moreover, Plaintiff had full expectation that Church Mutual would honor our claims. |
| **Pl.'s 1st Supp. Objections and Resps., dated 11/21/13** | No objection, but same response as above/no new response | Same as above/no new response |
| **Pl.'s 2nd Supp. Objections and Resps., dated 12/13/13** | Same as above/no new response | Storm and weather related events set forth within Plaintiff's most recent lawsuit caused damage to the subject property on or after March 1, 2011. Due the [sic] same, Plaintiff has provided estimates for damages from The Stephenson Group showing repairs to the subject structure in the amount of $2,833,287.28. In addition, repairs to other structures required an amount of $3,053.66. Finally there has bee [sic] a loss of business personal [sic] property in the amount of $139,974.84. *** |

| | | |
|---|---|---|
| **Pl.'s 3rd Supp. Objections and Resps., dated 4/24/13** | Objection. Plaintiff objects as this Interrogatory is overly broad, Subject to the foregoing objection and without waiving the same, Plaintiff provides the following answers:<br>(a) March 1, 2011;<br>(b) It was a result of storm and weather-related events following by repeating [sic] torrential rain events, and the condition of the property worsened after each occurrence . . . . | [Plaintiff] notified [Defendant] on April 18, 2011 of the claims underlying the present matter.  In addition, on October 15, 2011, despite delays in [Defendant] sending an adjuster to view the loss site, Mr. John Couture, of York Specialized Loss Adjusting met with Deacon Romeo at the loss site.<br><br>Additionally, as to the cost of repairs to the church, all such information was provided to Church Mutual on an ongoing basis. Plaintiff relied on our insurance company, Church Mutual to document each report and investigate each of these incidents. Moreover, Plaintiff had full expectation that Church Mutual would honor our claims. |
| **Pl.'s 4th Supp. Objections and Resps., dated 7/17/14** | Same as above/no new response | Same as above/no new response |
| **Pl.'s 5th Supp. Objections and Resps., dated 8/26/14** | The March 1, 2011 event was a windstorm that caused severe and continuing damage to the subject property. This is the only occurrence that Plaintiff is basing it suit upon. There logically were instances of rain, snow, and other weather-related events that occurred after the March 1, 2011 wind event, but, those are not specific occurrences giving rise to any independent claim in this matter. Those additional incidences simply caused continued damage that resulted from the initial event of March 1, 2011. Plaintiff cannot testify as to a specific date on which such other events occurred, but that they were after March 1, 2011. | Set forth in response to Interrogatory 6: Plaintiff is claiming the following amounts for the windstorm event of March 1, 2011. The specific line by line entries and totals are contained within the United Construction Consultants, LLC report which is in the possession of Defendant. Nothing has been paid toward the loss and all amount contained within the United Construction Consultants, LLC report are current unpaid and owed, as follows:<br><br>[See page 16 of this Opinion detailing itemization of damages totaling $2,877,300.21]. |

| Pl.'s 6th Supp. Objections and Resps., dated 9/4/14 | Same as above/no new response | Set forth in response to Interrogatory 6: |
|---|---|---|
| | | In regard to the expenses or losses claimed by the Plaintiff in association with the windstorm event of March 1, 2011, all such damage can be found within the previous expert estimate, authored by Shannon Cook with The Stephenson Group in this matter. Moreover, and specific to this Interrogatory and the Court Order regarding the same, Plaintiff would submit that the following damages occurred based upon the above described loss: |
| | | [See pages 18-21 of this Opinion detailing itemization of damages totaling $5,430,070.66]. |

(Doc. 28-2, at 14; Doc. 42-2, at 38; Doc. 42-3, at 4; Doc. 54-3, at 22-23; Doc. 67-1, at 6-7; Doc. 67-2, at 5-8).