UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OLIVET BAPTIST CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 1625 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CHURCH MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Olivet Baptist Church alleges that Church Mutual Insurance Company ("CMIC")

breached its insurance policy and violated § 155 of the Illinois Insurance Code, 215 ILCS

5/155(1), by denying a claim concerning property damage to the church. Doc. 18. The suit was

reassigned to the undersigned's calendar in May 2015. Doc. 85. With discovery closed and trial

set for March 28, 2016, Doc. 102, CMIC has moved for summary judgment, Doc. 103. As

discussed below, the principal issue is whether the damage arose from a windstorm in the

church's vicinity on March 1, 2011; if not, there is no coverage and CMIC prevails. Because

Olivet has not properly adduced evidence of a causal relationship between any windstorm on

March 1, 2011 and the property damage, CMIC's motion is granted.

**Background**

**A.       Evidentiary Issues**

Before setting forth the facts, the court addresses three evidentiary issues.

**1.       Olivet's Failure to File a Local Rule 56.1(b)(3)(B) Response to
         CMIC's Local Rule 56.1(a)(3) Statement**

Consistent with the local rules, CMIC filed a Local Rule 56.1(a)(3) statement of

undisputed facts along with its summary judgment motion. Doc. 106. Of the 75 factual

assertions in CMIC's statement, 73 cite evidentiary material in the record and are supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). The other two are statements of negation, asserting that Olivet has not adduced evidence or testimony to establish certain facts, Doc. 106 at ¶¶ 19-20, and so those statements could not be supported by specific citations to the record.

When it came time to respond to CMIC's summary judgment motion, Olivet filed what it styled a "response in opposition to defendant's statement of undisputed material facts." Doc. 117. The response does not directly address the 75 factual assertions in CMIC's Local Rule 56.1(a)(3) statement, but instead—much in the manner of a Local Rule 56.1(b)(3)(C) statement of additional facts—sets forth 32 additional facts. Doc. 117. Recognizing its failure to file an actual Local Rule 56.1(b)(3)(B) response to CMIC's Local Rule 56.1(a)(3) statement, Olivet asserts that its filing is "globally offered in support of Plaintiff's [summary judgment response brief] and acts to 'dispute' the allegedly 'undisputed' facts previously supplied by [CMIC's Local Rule 56.1(a)(3) statement]." *Id*. at 1-2.

Olivet's assumption that Local Rule 56.1 allowed it to respond to CMIC's Local Rule 56.1(a)(3) statement solely by filing something akin to a Local Rule 56.1(b)(3)(C) statement is incorrect. Local Rule 56.1(b)(3)(B) requires the non-movant to file "a response *to each numbered paragraph* in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(B) (emphasis added). The non-movant's submission of a Local Rule 56.1(b)(3)(C) statement of additional facts does not and could not

properly controvert "each numbered paragraph" of the movant's Local Rule 56.1(a)(3) statement, as it does not synch up with the factual assertions in the Local Rule 56.1(a)(3) statement.

The Seventh Circuit held as much in *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008). The plaintiff in *Ciomber*, who was injured when his house exploded, brought a negligence suit against the company that supplied him with liquefied petroleum. *Id*. at 637. The defendant moved for summary judgment and filed a Local Rule 56.1(a)(3) statement. *Id*. at 643. In support of his opposition, the plaintiff—like Olivet here—filed a "Rule 56.1 response … that … did not separate his proposed facts from his responses to [the defendant's] proposed material facts." *Ibid*. "[T]he district court refused to consider the facts proposed in [the plaintiff's] Rule 56.1 response," and the Seventh Circuit affirmed, holding that because the response did not comply Local Rule 56.1(b)(3)(B), which requires "a response to each numbered paragraph in the moving party's statement," "the district court did not err by refusing to consider the facts he proposed." *Id*. at 643-44 (internal quotation marks omitted).

The same result obtains here. The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (citing cases); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Here, the problem is not that Olivet did not *strictly* comply with Local Rule 56.1(b)(3)(B); rather, it is that Olivet did not comply *at all*. This court need not and will not attempt to map Olivet's 32 factual assertions onto CMIC's 75 factual assertions to determine

whether Olivet has adduced a genuine dispute of material fact as to any of CMIC's assertions; that is the purpose of a properly constructed Local Rule 56.1(b)(3)(B) response. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact. A litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court. The district court did not abuse its discretion in finding Curtis failed to comply with Rule 56.1 requirements."); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.") (internal quotation marks omitted). Accordingly, the court accepts as true the facts set forth in CMIC's Local Rule 56.1(a)(3) statement. *See Curtis*, 807 F.3d at 218 ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (internal quotation marks omitted); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Raymond v. Amritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

### 2. The February 2015 Order Barring Olivet from Adducing Additional Evidence Regarding Causation and Damages

The 75 factual assertions in CMIC's Local Rule 56.1(a)(3) statement have been deemed admitted, and it would undermine that holding—and utterly defeat the purpose of Local Rule

56.1(b)(3)(B)—to allow Olivet to circumvent any of those admissions with assertions in its noncompliant Local Rule 56.1 statement. *See Ciomber*, 527 F.3d at 643-44. Even putting that aside, many of the factual assertions in Olivet's Local Rule 56.1 statement are based on evidence that the court has barred Olivet from adducing.

In February 2015, following Olivet's repeated failure to produce certain documents, the court barred Olivet "from offering at trial or in any hearing any evidence of damages or causation that defendant requested and [Olivet] failed to produce on or before January 7, 2015." Doc. 77 at 16 (Marovich, J.) (reported at 2015 WL 764051, at *8 (N.D. Ill. Feb. 23, 2015)). Ignoring this order, Olivet's summary judgment materials cite the September 25, 2015 affidavit of Arnold Romeo, an Olivet deacon, to support its position that a windstorm on March 1, 2011 caused the damage to Olivet's property. Doc. 116 at 2-3, 6-8; Doc. 117 at ¶¶ 1-13; Doc. 117-1 (Romeo's affidavit). This violates the February 2015 order, and so the court disregards the Romeo affidavit and any assertions in Olivet's summary judgment papers that rely exclusively on that affidavit. Given this holding, it is unnecessary to resolve whether Romeo's affidavit should be stricken on the independent ground that it substantially contradicts his deposition testimony. Docs. 104-4, 104-5; Doc. 119 at 7.

### 3. Olivet's Experts

Olivet's summary judgment brief and Local Rule 56.1 statement also rely on the affidavits and reports of two purported experts, Tom Irmiter and Shannon Cook. Docs. 117-3, 117-4, 117-6, 117-7, 153-1. The February 2015 order (which was issued before the case was reassigned to the undersigned judge) appears not to have barred Olivet from disclosing experts regarding causation and damages; after all, the court in May 2015 (also before the reassignment) entered a schedule allowing Olivet to disclose experts by June 2015. Doc. 83 (Finnegan, M.J.). That said, for the reasons given above, Olivet cannot use its experts to contradict any of the

5

facts—including those concerning whether the damage to the church arose from a windstorm on March 1, 2011—deemed admitted in CMIC's Local Rule 56.1(a)(3) statement.  And even putting that aside, Irmiter's and Cook's opinions regarding causation fail to satisfy the standards set forth by Federal Rule of Evidence 702.

Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010).  "Expertise is a necessary but not a sufficient condition of admissibility under Rule 702."  *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999).  The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert."  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted).  The expert's proponent bears the burden of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### a.      Shannon Cook

Cook worked as a field adjuster for a large insurance company from 1988 to 2006, dealing primarily with commercial and residential property losses.  Doc. 117-6.  From 2006 to 2012, he prepared estimates of loss from wind, flood, hail, and fire, and also performed

appraisals. *Ibid*. Cook offers an opinion regarding the cost of repairing the damage to Olivet's property. Doc. 106 at ¶ 65; Doc. 117 at ¶¶ 29-32; Docs. 117-4 at 2, 153-1. Cook's opinions are based on the damage he observed during a site visit in December 2012. Doc. 106 at ¶ 52; Doc. 117-4 at 2.

CMIC argues that Cook's methodology is unreliable given his lack of knowledge as to when the damage occurred and whether it was caused by a windstorm. Doc. 103 at 12; Doc. 119 at 10-11; *see* Doc. 106 at ¶¶ 53-64. Specifically, although Cook observed the damage to the property, he does not know when the damage occurred and, in fact, agrees that it could have been caused on some date other than March 1, 2011. Doc. 106 at ¶¶ 53, 56-58, 60. Cook also assumed but did not verify that the damage was caused by wind. *Id*. at ¶ 55.

The Seventh Circuit has cautioned that "the test for reliability for nonscientific experts is 'flexible.'" *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (quoting *Kumho*, 526 U.S. at 150). Unlike scientific or technical experts, whose hypotheses can be tested or subjected to peer review and whose methods can be measured against specific industry standards, an insurance adjuster and appraiser's cannot be so mechanically scrutinized. *See Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) (holding that nonscientific expert testimony in the field of premises security did "not easily admit of rigorous testing and replication"). Cook's opinions rely on his experience, and expert testimony "is not unreliable simply because it is founded on [a witness's] experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting Fed. R. Evid. 702); *see also Kumho*, 526 U.S. at 150 (distinguishing expert testimony based on science and engineering from "other cases," in which "the relevant reliability concerns may focus upon personal knowledge or

experience," and reaffirming that the *Daubert* factors "do *not* constitute a 'definitive checklist or test'") (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593 (1993)).

The court will assume that Cook is qualified to offer an opinion regarding how much it would cost to repair the property damage. But Cook cannot offer an opinion as to whether any of the damage arose from a windstorm on March 1, 2011. Indeed, nothing in his affidavit or report even *purports* to offer an opinion on that subject. And in its surreply brief, Olivet does not suggest that it is offering Cook to testify on that subject. Doc. 134 at 5-6. Accordingly, even if Cook could testify regarding the cost to repair the church on the *assumption* that the damage arose from a windstorm on March 1, 2011, he may not testify on the causation question itself. *See generally BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011) (holding that "[t]he [district court] … confused proof of causation with proof of amount of damages and so denied the plaintiffs the benefit of the easier burden of proving damages than of causation"); *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 210 (2d Cir. 2009) (finding unconvincing a causation argument for which "the only other evidence on which [the plaintiff] relied was the testimony of … [the other party's] expert on the amount of damages"); *Talmage v. Harris*, 354 F. Supp. 2d 860, 864 (W.D. Wis. 2005) ("In preparing his report, Kleinheinz assumed that plaintiff's losses … were attributable to defendants' alleged inactions. In other words, Kleinheinz assumed that causation was present and limited his analysis to a calculation of the damage amount.").

### b. Tom Irmiter

Since 2004, Irmiter has been the owner and principal of Forensic Building Science, Inc., which "conducts on-site inspections and evaluations … of foundation assemblies, wall assemblies, curtain and storefront walls, soffit assemblies, and attic/roof assemblies to evaluate

as-built conditions and determine causation for damages to these assemblies." Doc. 117-7 at 1. Irmiter has several licenses and certifications related to building forensics and fifteen years of experience in the field, which itself followed three decades in the construction industry. *Id*. at 1-6. He has been a construction consultant since 1985, and has provided testimony or appraisal in 110 insurance investigations or court cases and filed affidavits or provided depositions in 56 such matters. *Id*. at 6, 11-16.

On April 16, 2015, more than four years after the alleged windstorm, Irmiter inspected the property while accompanied by Henry Sawyer, another deacon at Olivet. Doc. 118 at ¶ 20. Irmiter observed "plaster cracks, efflorescence, and peeling paint, all of which was consistent with an older building." *Id*. at ¶ 22. He also surveyed historical records on Google Maps, Doc. 117-3 at 2, and the website Weather Underground, http://www.wunderground.com, which shows that local temperatures were above fifty degrees Fahrenheit in mid-February 2011, before falling below freezing for eight of nine days between February 20, 2011, and February 28, 2011. Doc. 118 at ¶¶ 24-25. Based on those weather patterns, the reporting of leakage on March 1, 2011, his inspection, and "information provided by representatives of the church," Irmiter concluded that March 1, 2011 was "the reasonable date of loss." *Id*. at ¶¶ 26-28. Specifically, Irmiter's report offers the following conclusions:

> 4.1 No leaks were reported after the February 1, 2011 snowstorm and snowmelt, which occurred 15 days later. Leakage was reported during the melting that occurred on March 1, 2011. In my opinion, the more reasonable date of loss is the reported date of loss, March 1, 2011, which is when the temperatures warmed to the point of melting the accumulating ice on the roof causing the leaking to occur.
>
> 4.2 According to Deacon Sawyer who opened the church for the previous inspections by the insurance company, no one asked Olivet to distinguish between old and new damage. When forming a causation analysis it is essential to obtain as much pre-loss condition information as possible in order to eliminate causation and arrive at a reasonable cause for a loss. While I

> have not read the reports produced by the insurance company it appears that
> this was not done as part of the insurance company's investigation.
>
> 4.3    In my opinion, based on my site visit, information provided to me by
> representatives of the church and my review of weather records, is that
> damage did occur on March 11, 2011 [*sic*] in the form of water intrusion into
> the interior of the building at a number of locations.

Doc. 117-3 at 3-4.

CMIC contends, correctly, that Irmiter's causation opinions fall outside his area of

expertise.  Doc. 119 at 11-12.  As an initial matter, reviewing Google Maps images and historical

weather records bears no relationship to Irmiter's areas of expertise, which concern "on-site

inspections and evaluations" and "[p]reparing project[-]specific repair scopes."  Doc. 117-7 at 1.

More significantly, the report's causation conclusions are premised largely on information

provided by Sawyer during the April 2015 site visit.  Irmiter "asked Deacon Sawyer to show

[him] three types of damaged areas," distinguishing between damage that predated "the March 1,

2011 water intrusions," damage that occurred on March 1, 2011, and damage "that is ongoing

after March 1, 2011 and getting worse."  Doc. 117-3 at 1-2.  The report does not indicate that

Irmiter, using his expertise in building forensics, identified these three categories of damage;

rather, he took as a given Sawyer's representation of and distinctions between the damaged

areas.

Accordingly, even if Irmiter could offer expert opinions on some matters pertinent to this

case, he cannot offer opinions regarding whether a windstorm on March 1, 2011 caused the

property damage he witnessed in April 2015.  Although "an expert witness is not required to

verify all the facts on which he relies," *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir.

2015), "[r]elaying the plaintiffs' likely testimony is not an example of expertise."  *Lang v. Kohl's

Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).  This limiting principle "is intended to

eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through

the simple expedient of proffering an expert in lay witness clothing." *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 864 (7th Cir. 2009) (internal quotation marks omitted). Put another way, Olivet cannot deploy Irmiter as a vehicle to introduce Sawyer's April 2015 lay observations regarding what caused the property damage. As the Seventh Circuit has explained: "The entirety of an expert's testimony cannot be the mere repetition of the out-of-court statements of others, and … an expert witness may not simply summarize the out-of-court statements of others as his testimony. … An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) (internal quotation marks and citations omitted). This is particularly so given that the February 2015 order barred Olivet from offering any causation or damages evidence that it had not produced on or before January 7, 2015. 2015 WL 764051, at *8.

An additional obstacle to using Irmiter in that way arises from the fact that Sawyer does not have sufficient personal knowledge regarding the cause of the property damage to testify about it himself, much less to feed it to Irmiter. Sawyer was not present at the church during, and thus did not witness, the alleged windstorm on March 1, 2011, and he never investigated how water allegedly penetrated the building after that date. Doc. 106 at ¶¶ 36-37. "While experts are allowed to give testimony based outside of their personal experience or observation, lay witnesses are not." *Von der Ruhr*, 570 F.3d at 864.

And, finally, Olivet has forfeited any argument that Irmiter should be allowed under Rule 702 to offer expert opinions regarding causation. Its defense of Irmiter comprises a paragraph, stating in relevant part: "Olivet would argue more specifically that Tom Irmiter's qualifications not only surpass the qualifications needed under the knowledge test, but that of the helpfulness test as well. … Olivet would therefore show, the site visit and extensive research conducted by

11

Tom Irmiter would allow him to offer opinions and provide evidence to substantiate the basis of those opinions. This is further exhibited in his report and would surely survive any *Daubert* challenge by" CMIC. Doc. 134 at 5. These are conclusory assertions, not legal arguments, resulting in a forfeiture. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted).

## B. Factual Predicate for CMIC's Summary Judgment Motion

The following facts are stated as favorably to Olivet, the non-movant, as the record, Local Rule 56.1, the February 2015 order, and Rule 702 allow. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering CMIC's summary judgment motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

Olivet is located at 3101 South King Drive in Chicago, Illinois. Doc. 106 at ¶ 1. Olivet purchased from CMIC an insurance policy, effective from February 28, 2011 through February 28, 2014. Doc. 104-1 at 3; Doc. 106 at ¶ 6. The policy provides that CMIC will "pay for direct physical loss of or damage to Covered Property at the [church] caused by or resulting from any

Covered Cause or Loss." Doc. 104-1 at 26; Doc. 106 at ¶ 7. Pertinent here, the coverage includes:

> 4. Windstorm or Hail, but not including:
>
>> a. Frost or cold weather;
>>
>> b. Ice (other than hail), snow or sleet, whether driven by wind or not; or
>>
>> c. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand, or dust, whether driven by wind or not, *unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand, or dust enters*.

Doc. 104-1 at 40 (emphasis added); Doc. 106 at ¶ 8. Losses are covered at "actual cash value," which the policy defines as "the amount it would cost to repair or replace Covered Property with material of comparable kind and quality, less allowance for deterioration and depreciation, including obsolescence." Doc. 104-1 at 5, 20; Doc. 106 at ¶¶ 9-10.

On April 18, 2011, Olivet reported a claim to CMIC. *Id*. at ¶ 11. Olivet asserted that a windstorm on March 1, 2011 had damaged the church's roof and interior portions of the main sanctuary, leading to water damage in the interior. *Ibid*. Although Olivet initially also sought compensation for damage to a fellowship hall and education building, the February 2015 order barred Olivet from seeking compensation for that damage. 2015 WL 764051, at *8; Doc. 106 at ¶¶ 16-18. Following an investigation that included a physical inspection, CMIC denied Olivet's claim on February 14, 2012. Doc. 75-1; Doc. 106 at ¶¶ 12, 15.

Olivet has not properly adduced any evidence to show that a windstorm occurred in the area of the church on March 1, 2011, or that a windstorm on that date "caused damage to the [church's] roof or walls … through which rain or snow entered [the church] and damaged the interior or outside of [the church]." Doc. 106 at ¶¶ 19-20. Tom Piazza, a meteorologist retained by CMIC, concluded that there were no severe winds on February 28, March 1, or March 2, 2011

anywhere near the church. *Id*. at ¶¶ 70-71. Moreover, it did not rain or snow near the church on those three days, and there were no winds exceeding 31 miles per hour—a wind speed that over the past five decades has occurred on average 78 days per year in Chicago—on March 1, 2011. *Id*. at ¶¶ 73-75. The National Weather Service defines "severe winds" as winds greater than 58 miles per hour. *Id*. at ¶ 71.

No one at Olivet has personal knowledge of the duration of the allegedly high winds on March 1, 2011. *Id*. at ¶¶ 26, 36. Deacon Romeo was not present at the church during the alleged windstorm, has no specific recollection of any storm or personal knowledge of the wind speed on March 1, 2011, and does not know what caused water damage to the interior or the church. *Id*. at ¶¶ 22-23, 27, 29. Deacon Sawyer and Eugene King, another deacon at Olivet, were not present in the church during the alleged windstorm. *Id*. at ¶¶ 36, 38. Sawyer never personally investigated how water penetrated the building, and King admits that he is not qualified to render an opinion on the cause and extent of the damage, although he does "believe" that the damage was caused by a "snowstorm." *Id*. at ¶¶ 37, 40; Doc. 104-8 at 8 (pp. 24:15-25:22); Doc. 118 at ¶ 14.

Prior to March 1, 2011, the church's roof exhibited visible damage, including missing and destroyed shingles, and the church had experienced leaks in the roof and interior ceiling over the previous decade, Doc. 106 at ¶¶ 21, 34, 39, although King does not remember "seeing damage to the roof or sanctuary" prior to March 1, 2011. Doc. 118 at ¶ 19. David Cronbaugh, whom Olivet retained as a roofer during CMIC's claim investigation, observed damage to the roof but does not know when the damage occurred. Doc. 106 at ¶¶ 13, 41.

During CMIC's investigation, Olivet retained Stephenson Group, a claims adjuster, Doc. 104-10 at 4, to prepare a cost estimate for the necessary repairs. Doc. 106 at ¶ 14. Although

Stephenson Group was not asked to determine the date of the wind damage and made no independent effort to verify the date of loss, *id*. at ¶¶ 43-50, Romeo believes that Stephenson Group's report is an accurate reflection of the damage caused to the church by the alleged windstorm of March 1, 2011. *Id*. at ¶¶ 31-32. Neither Stephenson Group nor Olivet has attempted to distinguish property damage that predated March 1, 2011 from the damage that allegedly occurred on or after that date. *Id*. at ¶¶ 32, 48-51. Kevin Mohr, an insurance adjuster at Stephenson Group, did not determine the date of damage and admits that it is impossible to determine when the damage occurred. Doc. 104-12 at 25; Doc. 106 at ¶¶ 67-69.

**Discussion**

In considering CMIC's motion, the court is mindful that "a nonmovant's failure to … comply with Local Rule 56.1 … does not … automatically result in judgment for the movant. The ultimate burden of persuasion remains with [the movant] to show that it is entitled to judgment as a matter of law." *Raymond*, 442 F.3d at 608 (internal citation omitted).

**I.  Claim for Breach of the Insurance Policy**

Olivet alleges that CMIC breached the insurance policy by denying its claim. Because the policy includes Illinois-specific modifications, Doc. 104-1 at 49-51, 98, 110-11, 134-35, 151-57, CMIC believes that the policy is governed by Illinois law, Doc. 106 at ¶ 5, the alleged breach occurred in Illinois, and Illinois is the forum State, the court will apply Illinois law. *See Fednav Int'l v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.") (internal quotation marks omitted).

"Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (internal quotation marks omitted). In Illinois,

> insurance policies are contracts; the general rules governing the interpretation and construction of contracts govern the interpretation and construction of insurance policies. Illinois courts aim to ascertain and give effect to the intention of the parties, as expressed in the policy language, so long as doing so does not contravene public policy. In doing so, they read the policy as a whole and consider the type of insurance purchased, the risks involved, and the overall purpose of the contract. If the policy language is unambiguous, courts apply it as written. Policy terms that limit an insurer's liability are liberally construed in favor of coverage, but only when they are ambiguous, or susceptible to more than one reasonable interpretation.

*Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also Ind. Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 900 (7th Cir. 2002) ("To ascertain the meaning of the policy's words and the intent of the parties, we construe the policy as a whole with due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract."). Although all "ambiguities" in an insurance policy "must be resolved in favor of the insured," *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 719 (7th Cir. 2015), "a court will not search for ambiguity where there is none." *Phillips*, 714 F.3d at 1020 (quoting *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.,* 860 N.E.2d 307, 314 (Ill. 2006)) (internal quotation marks omitted); *see also Schuchman v. State Auto Prop. & Cas. Ins. Co.*, 733 F.3d 231, 238 (7th Cir. 2013) ("[T]he rule of liberal construction in favor of the insured is a rule of last resort which must not be permitted to frustrate the intention the parties have expressed, if that can otherwise be ascertained."). "In construing a policy, governing legal authority must be taken into account as well, for a policy term may be considered unambiguous where it has acquired an established legal meaning." *Phillips*, 714 F.3d at 1020 (alterations and internal quotation marks omitted). Likewise, "Illinois law requires that provisions of an insurance

16

agreement be interpreted in the factual context of the case." *Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. 8*, 314 F.3d 895, 901 (7th Cir. 2002).

In a dispute over coverage, "the initial burden of proof lies with an insured to prove that its asserted loss was a covered loss under the terms of the insurance policy." *Old Second Nat'l Bank v. Ind. Ins. Co.*, 29 N.E.3d 1168, 1176 (Ill. App. 2015) (citing *Hays v. Country Mut. Ins. Co.*, 192 N.E.2d 855, 858 (Ill. 1963)). If the insured meets its burden of proof, the insurer has "the burden of proving that an exclusion applies," and the insured in turn "the burden to prove that an exception to an exclusion restores coverage." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010); *see also Old Second*, 29 N.E.3d at 1176.

On the summary judgment record, a reasonable factfinder could not find that the property damage was a covered, non-excluded loss under the policy. Olivet seeks to recover under the provision, reproduced above, providing coverage for damage caused by a "windstorm." Doc. 18 at ¶¶ 9, 25; Doc. 104-1 at 40; Doc. 106 at ¶ 8. Although the policy does not define "windstorm," Illinois law sets forth this standard for disputes involving coverage under windstorm provisions:

> [T]o establish damage as a direct loss caused by [a] windstorm, there must be evidence both [1] that wind of sufficient velocity and force to do the damage allegedly prevailed in the vicinity of the damaged property during the time the damage is alleged to have occurred, and [2] that the wind caused the damage alleged.

*Couri v. Home Ins. Co.*, 368 N.E.2d 1029, 1032 (Ill. App. 1977) (citing *Friedman v. Emp'rs' Fire Ins. Co.*, 83 N.E.2d 40 (Ill. App. 1948)); *see also* Steven Plitt et al., 11 *Couch on Ins.* § 153:29 & n.3 (3d ed. 2015) ("In order to recover under a policy, the insured must establish both that there was a windstorm at the time and place of the incident and that the windstorm caused the damages sustained."). Olivet cannot satisfy either requirement.

As to the first requirement, whether "wind of sufficient velocity and force to do the damage … prevailed in the vicinity of the damaged property during the time the damage is

17

alleged to have occurred," Olivet has adduced no evidence regarding the prevailing wind speed near the church on March 1, 2011. Deacons Romeo, Sawyer, and King were not at the church on March 1, 2011, and no other Olivet witness has admissible evidence regarding whether a windstorm occurred on that date. Doc. 106 at ¶¶ 22, 26, 36, 38, 43, 51, 67. In the absence of evidence to the contrary, the court accepts Piazza's unrebutted assertion that winds in the area of the church did not exceed 31 miles per hour on March 1, 2011. *Id*. at ¶ 73. Such wind speeds occur on average 78 days per year in the Chicago area, and are barely half the speed of those that the National Weather Service defines as "severe" (58 miles per hour). *Id*. at ¶ 71.

The question posed by the first requirement is whether such winds were "sufficient … to do the damage," meaning whether they *could* have caused the damage. *See* Plitt et al., *supra*, § 153:29 ("When the insurer has not defined 'windstorm' in the policy, courts have emphasized that the wind must be shown to be of a force sufficiently capable to damage the insured property either by its own unaided action or by projecting some object against it.") (internal quotation marks omitted). Olivet has not adduced any evidence that 31-mile per hour winds would have been sufficient to cause the alleged damage to the church. And Olivet has made no argument and presented no evidence about the church's condition on March 1, 2011 suggesting that it was vulnerable to such winds. Olivet accordingly has not satisfied its burden on the first requirement articulated in *Couri*. *See Friedman*, 83 N.E.2d at 41 ("[T]he evidence does not fairly tend to establish that there was a windstorm or a wind sufficiently strong to cause the damage to the skylight or that the damage was caused by wind or a windstorm.").

Even if Olivet could establish that winds near the church on March 1, 2011 were *sufficient* to cause the claimed damage, it has not adduced evidence that would allow a reasonable factfinder to conclude that such winds actually *did* damage the church's exterior or,

18

importantly, that such external damage allowed the entrance of water that caused the subsequent damage to the ceiling and sanctuary in the church's interior. By failing to properly respond to CMIC's Local Rule 56.1(a)(3) statement, Olivet admitted CMIC's assertion that "[a]t no time in this litigation, including prior to January 7, 2015, has [Olivet] produced any evidence or testimony that a wind storm on March 1, 2011 caused damage to the roof or walls of [the church] through which rain or snow entered [the church] and damaged the interior or inside of [the church]." Doc. 106 at ¶ 20. This is fatal to Olivet's claim, as the policy specifically excludes "[l]oss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand, or dust" that does not enter through an opening created by "wind … damage." Doc. 104-1 at 40.

Even putting aside Olivet's admission of CMIC's Local Rule 56.1(a)(3) statement, Olivet in fact has not adduced sufficient evidence to show that a windstorm damaged the church's exterior on March 1, 2011 or that the interior sustained damage caused by rain, snow, sand, or dust that entered through the exterior damage. Deacons Romeo, King, and Sawyer were not at the church at the time. Doc. 106 at ¶¶ 24, 36, 38. Romeo testified in his deposition that he did "not want to speculate" about the cause of the damage. *Id*. at ¶ 29. King "admits that he is not qualified to render an opinion," and Stephenson Group and Cronbaugh could not date the damage or assess causation. *Id*. at ¶¶ 40-41, 45, 62-64, 69. Sawyer testified at his deposition that during his time as business manager at Olivet between 2004 and 2007, the church experienced leaks in the roof and interior ceiling that resulted in interior water damage. *Id*. at ¶ 34. Yet Olivet "has not … made an effort to separate damage" that predated the alleged windstorm from that which resulted from the windstorm. *Id*. at ¶ 33.

19

Ultimately, despite Olivet's unsupported submission that "[e]yewitness testimony clearly establishes that the" alleged windstorm caused the damage, Doc. 116 at 1, its only "evidence" is King's "belie[f]" that the damage was caused by a "snowstorm." Doc. 104-8 at 8; Doc. 118 at ¶ 14. King's belief is not based on personal knowledge, but it nevertheless provided Romeo with his "knowledge" of the event, which in turn informed the Stephenson Group's report and Cook's opinion. Doc. 106 at ¶¶ 27, 38. Similarly, Sawyer's belief, which is also not based on personal knowledge of the storm, informed Irmiter's report. *Id.* at ¶¶ 34-37; Doc. 117-3 at 3-4; Doc. 118 at ¶¶ 20-23. These strings of conversations "fail to thwart summary judgment because they are not based on personal knowledge as required by both the Federal Rule of Civil Procedure on summary judgment, Rule 56(e) … and by Federal Rule of Evidence 602." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). Olivet's theories are mere "flights of fancy, speculations, hunches, intuitions or rumors about matters remote from" the personal experience of Romeo, Sawyer, and King, *ibid.* (internal quotation marks omitted), and they accordingly are insufficient.

Even putting aside the foregoing, there is an independent ground for summary judgment: Olivet's failure to put forth damages evidence that corresponds with a legally appropriate damage theory. "To state a claim for breach of contract under Illinois law, a party must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014) (internal quotation marks omitted); *see also Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016). The insurance policy specifies that CMIC will cover losses at "actual cash value." Doc. 104-1 at 5, 20. Olivet's damages evidence, however, reflects only replacement value. Doc. 106 at ¶ 65.

"In arriving at 'actual cash value' a deduction must be made from replacement cost to account for depreciation." *Carey v. Am. Family Brokerage, Inc.*, 909 N.E.2d 255, 281 (Ill. App. 2009) (citing, *e.g.*, *Chi. Title & Trust Co. v. U.S. Fid. & Guar. Co.*, 511 F.2d 241, 244-45 (7th Cir. 1975)) (alterations and internal quotation marks omitted); *see also Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 774-75 (7th Cir. 2013) (explaining that the difference between actual cost value and replacement cost coverage is that the former "deducts for depreciation"). Yet having adduced no evidence of depreciation, Olivet cannot bridge the gap between replacement value, on which Cook has opined, and actual cash value. And because it has failed to adduce damages evidence sufficient to make its case on the only damage theory available, actual cash value, Olivet cannot prove this element of its claim, warranting summary judgment. *See Merry Gentleman, LLC v. George & Leona Prods., Inc.*, 799 F.3d 827 (7th Cir. 2015) (affirming summary judgment for the defendant where the plaintiff had failed to propose a legally viable damages theory on the summary judgment record).

Moreover, Olivet's summary judgment brief mentions damages only in passing, Doc. 116 at 12-13, and does not address the distinction between actual cash value and replacement value or explain how its damages estimate complies with the insurance policy. That amounts to a forfeiture on the damages element, also warranting summary judgment. *See Batson*, 746 F.3d at 833; *Milligan*, 686 F.3d at 386; *Judge*, 612 F.3d at 557; *Salas v. Wis. Dept. of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment.").

## II.    Section 155 Claim

Olivet's § 155 claim fares no better. Section 155 provides in relevant part:

> In any action … wherein there is in issue the liability of a company on a
> policy or policies of insurance or the amount of the loss payable thereunder, or

> for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of [three designated] amounts.

215 ILCS 5/155(1). Section 155 provides an "an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Phillips*, 714 F.3d at 1023 (internal quotation marks omitted). "Because this statute is penal in nature[,] its provisions must be strictly construed." *Ibid.* (internal quotation marks omitted). "An insurer's actions are not vexatious and unreasonable if (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *TKK USA, Inc. v. Safety Nat'l Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013) (internal quotation marks omitted). In short, "[i]f there is a bona fide dispute regarding coverage—meaning a dispute that is real, genuine, and not feigned—statutory sanctions under section 5/155 are inappropriate." *Phillips*, 714 F.3d at 1023 (alteration and internal quotation marks omitted).

Because CMIC did not violate its obligations under the policy, it cannot be held liable for engaging in bad faith or improper practices under § 155. *See Rhone v. First Am. Title Ins. Co.*, 928 N.E.2d 1185, 1196 (Ill. App. 2010) ("Where the policy is not triggered, there can be no finding that the insurer acted vexatiously and unreasonably in denying the claim."); *Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 747 N.E.2d 955, 968 (Ill. App. 2001) ("The fact that we have found that Westchester's filing of its federal declaratory action comported with Illinois law and have reversed the trial court's judgment entered to Heileman conclusively shows that Westchester's actions in denying coverage were not vexatious and unreasonable."); *AU Elecs., Inc. v. Harleysville Grp., Inc.*, 82 F. Supp. 3d 805, 816 (N.D. Ill. 2015) (same). In any event,

Olivet's response brief does not mention the § 155 claim, let alone defend it from summary judgment, thereby resulting in yet another forfeiture. *See Batson*, 746 F.3d at 833; *Milligan*, 686 F.3d at 386; *Judge*, 612 F.3d at 557; *Salas*, 493 F.3d at 924.

**Conclusion**

For the foregoing reasons, CMIC's summary judgment motion is granted. Judgment will be entered in favor of CMIC and against Olivet, and the case will be closed.

February 29, 2016

_____
United States District Judge